UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| DAVID L. LEWIS, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> LARRY MILLS, TODD DAMILANO, ) <br> SCOTT CORRIE, and CLINT GRAY, ) <br> ) <br> Defendants. ) | Case No. 09-CV-2090 |

**OPINION**

Plaintiff, David L. Lewis, filed his First Amended Complaint (#36) pursuant to 28 U.S.C. §§ 1983 and 1988 against Defendants Larry Mills, Todd Damilano, Scott Corrie, and Clint Gray on January 6, 2010. Defendants Mills and Damilano filed their Motion for Summary Judgment (#58) on December 15, 2010, which was joined by Defendants Corrie (#60) and Gray (#61). Plaintiff filed his Response (#69) on February 18, 2011. Defendants have filed their Replies (#76, 77, 78). Defendant Gray also filed a Motion for Rule 11 Sanctions (#64). All pending motions are fully briefed and ready for judgment. For the following reasons, Defendants' Motions for Summary Judgment (#58, 60, 61) are all GRANTED in full. Defendant Gray's Motion for Rule 11 Sanctions (#64) is DENIED.

FACTUAL BACKGROUND

Plaintiff worked as a part time police officer for the Village of Belgium, Illinois, between October 2003 and February 2007. Defendant Larry Mills was a licensed attorney and worked as the First Assistant State's Attorney for Vermilion County. Defendant Todd Damilano worked as a

Deputy Sheriff/Investigator for the Vermilion County Sheriff's Department (VCSD). Defendant Scott Corrie was the owner and operator of the Playpen Gentlemen's Club (the Playpen). Defendant Clint Gray, Plaintiff's brother, visited the Playpen as a patron on occasion and is friendly with Defendant Corrie.

This case arises out of a series of events occurring in 2006 and early 2007. Plaintiff was accused of various sexual offenses against women who danced at and were patrons of the Playpen Gentlemen's Club. During the same time period, Vermilion County First Assistant State's Attorney Larry Mills was the subject of a Federal Bureau of Investigation (FBI) investigation into whether he gave criminal defendants favorable treatment in exchange for cocaine and sexual favors provided through the Playpen. Plaintiff alleges that his cooperation with the FBI in the Mills investigation, and his refusal to go along with Mills's corruption, led to retaliation by Defendants in the form of false criminal allegations against him.

**Criminal Allegations Against Plaintiff**

On March 17, 2006, shortly after 3:00 am, Danielle Perry, a Playpen dancer, was driving home from work when she was pulled over by Plaintiff for a traffic stop. Plaintiff was in full uniform and driving his Village of Belgium squad car. After exchanging words with Plaintiff, Perry drove off in her vehicle without Plaintiff's permission, leaving Plaintiff along the roadway. Later that day Perry went to the VCSD and spoke with a deputy. Perry claimed Plaintiff had kissed her and grabbed her during the traffic stop. Perry stated she came forward of her own volition and that none of the Defendants ever directed, coaxed, or induced her to come forward and testify against Plaintiff. Perry's initial allegations against Plaintiff were investigated by VCSD Captain Rod Kaag. On March 21, 2006, Perry came to the Vermilion County Public Safety Building and provided Kaag

with a tape recorded statement regarding what had occurred during the traffic stop. Neither Damilano nor Mills had any involvement in Perry's statements to the VCSD and Captain Kaag. On March 23, 2006, after obtaining a grand jury subpoena for Perry's cell phone records, Captain Kaag advised Mills that the VCSD was investigating Plaintiff. According to Kaag, however, he did not ask Mills for any guidance, direction, or assistance in the investigation.

In April 2006 another Playpen dancer, Lacrisha Carrigan, was interviewed by Kaag. Carrigan claimed that one year earlier Plaintiff, while on duty as a Belgium police officer, had shown her pictures of his genitals next to a beer bottle. In April 2006 Defendant Damilano met with another Playpen dancer, Rebecca Lee, at the Vermilion County Public Safety Building. Lee told Damilano that she had been coerced by Plaintiff in January 2006 into giving Plaintiff oral sex to avoid a traffic ticket. Lee then provided Damilano and VCSD Investigator Bill Hurt with a tape recorded statement regarding the incident. Damilano provided Kaag with a copy of his report of the Lee incident. At the beginning of 2006, Belgium Police Chief Dale Ghibaudy met with his officers during a monthly meeting and explicitly advised them not to go into the Playpen unless there was a specific call for service. Chief Ghibaudy testified in his deposition that he believes Plaintiff repeatedly and grossly violated his directive in 2006 not to go into the Playpen unless there was a call for service.

On January 19, 2007, Audrey White went to the Belgium Police Department and complained to Chief Ghibaudy about an incident that had occurred one month earlier involving Plaintiff. Ghibaduy contacted Damilano and advised him of White's allegations. White worked for Defendant Clint Gray at Fat Boy Subs, but had encountered Plaintiff at the Playpen, where she was visiting as a patron, on December 23, 2006. White complained that Plaintiff tried to take liberties with her that

night. On January 19, 2007, White filled out a written complaint with the Belgium Police Department, complaining about Plaintiff's conduct on December 23-24, 2006. On January 22, 2007, White gave Damilano a tape-recorded statement in which she stated that Plaintiff had knocked on the door of her house in the early morning of December 24, 2006, in full uniform, and that he had asked her to leave her residence and come with him in his police car. Plaintiff then drove White to a secluded area and started kissing her without her consent.

In February and March 2007, Damilano interviewed four more women who claimed they had been victimized by Plaintiff. Cheryl Forshier (Playpen employee) recounted that Plaintiff paid her for sex in 2005. Ashley Grider (Steak and Shake employee) claimed she had been subjected to ongoing and persistent harassment by Plaintiff. Jennifer Garrett recounted an incident in September 2004 when she was working as a Playpen dancer when Plaintiff (while on duty) propositioned her, reached under dress, and grabbed her crotch. Amy Dow (Playpen employee) testified that she had sex twice with Plaintiff in 2006: once at the Belgium Police Department and the other time in her car in the police department parking lot. Dow claims that, at the very minimum, she was coerced by Plaintiff. Sometime in February or March 2007, Kaag and Damilano met with Mills and turned over all their reports in connection with their investigation of Plaintiff to Mills.

Kaag and Mills did not have any other conversations in 2006 about Plaintiff besides the March 23, 2006, conversation where Kaag informed Mills of the Perry investigation. Kaag did not ask Mills to take any action against Plaintiff in 2006 and did not give Mills the VCSD police reports concerning Plaintiff. Further, in his affidavit, Captain Kaag states that all of Damilano's investigative efforts were done under his (Kaag's) direction and that he (Kaag) reviewed all

reports in connection with the investigation. Kaag did not turn over the reports to Mills until after Kaag decided there was sufficient evidence against Plaintiff.

### FBI Investigation of Larry Mills

At some time prior to 2006, the FBI began to investigate Mills on suspicion that he had used drugs and/or provided favorable deals on criminal cases in exchange for drugs and other favors. In December 2006, FBI Special Agent Luke Humphrey and Illinois State Police Investigator Troy Phillips interviewed Belgium Police Chief Dale Ghibaudy at the police department regarding Mills. On December 13, 2006, Humphrey and Phillips met with Plaintiff at the police department. Plaintiff indicated during the interview that he had no knowledge of any drug trafficking or use by Mills or of Mills providing favorable treatment in criminal cases in exchange for drugs or sexual favors. Plaintiff did say he had heard rumors to that effect, however. At the completion of the interview, Humphrey handed Plaintiff his business card and told Plaintiff to call him if he heard anything more. However, neither Humphrey or Phillips asked Plaintiff to investigate the matter or take any further action in connection with the FBI investigation of Mills. From the date of the interview, December 13, 2006, to the date he was indicted by the grand jury, April 11, 2007, Plaintiff had no contact whatsoever with Humphrey or Phillips.

Plaintiff claims to have had a conversation with Defendant Clint Gray on December 17, 2006, in which the two discussed Plaintiff's December 13, 2006 interview with the FBI. Plaintiff states that Gray told him "your badge needs to stay in the car." Gray told Plaintiff he was "making some very powerful and dangerous people very uncomfortable." When Plaintiff asked him what he was talking about, Gray told him he knew Plaintiff had spoken with the FBI

about Mills and Corrie. Gray asked Plaintiff what he knew about Mills and Plaintiff told him that "the FBI has some concerns he is involved in something not exactly on the up and up with the Playpen." Gray then told Plaintiff "Larry Mills runs this county." Gray explained that Mills would receive cocaine from Scott Corrie and that Mills would then prosecute competing drug dealers. Mills would also have sex with girls provided by Corrie. Gray told Plaintiff that Plaintiff could double his salary if he went along the scheme. Plaintiff said he would not get involved and was going to do his job. Gray then said "you know I can't protect you, right?" Gray denies that this conversation ever took place.

After the alleged conversation with Gray, Plaintiff spoke to sister-in-law Jennifer Garrett, a Playpen dancer. Garrett told Plaintiff that Corrie had an apartment in Tilton, Illinois, where she and other strippers would go to have sex with Mills and do cocaine. Garrett also told Plaintiff that she had sex with Damilano on multiple occasions and that if she had legal problems, all she would do is tell law enforcement officers to contact Damilano.

Mills was never charged with any crimes in connection with the FBI and Illinois State Police investigation.

**The Criminal Case Against Plaintiff**

On March 30, 2007, a Vermilion County Grand Jury was convened to consider charges against Plaintiff. Six women (Audrey White, Amy Dow[1], Danielle Perry, Jennifer Garrett,

---

[1] On April 3, 2008, under oath in state court, Dow recanted her grand jury testimony, instead testifying that in late 2006 or early 2007 Scott Corrie had called together all the girls who were working at the Playpen and told them they would not have to pay "house fees" if they made up statements about Plaintiff. Corrie did this because he felt Plaintiff was hurting his business and did not want Plaintiff in the club "because of the cocaine going through it." She later recanted this testimony as well, and was convicted of perjury because of her April 2008 trial testimony. In her deposition for this case, Dow stated that her 2007 grand jury testimony about

Lacrisha Carrigan, and Ashley Grider) testified under oath regarding Plaintiff's actions against them. According to Plaintiff, immediately before Plaintiff was going to testify before the grand jury, Mills asked him about what he told the FBI. When Plaintiff told Mills he did not know what Mills was talking about, Mills responded "Wrong answer." On April 11, 2007, Plaintiff was indicted by the grand jury on 49 felony counts of official misconduct, armed violence, criminal sexual assault, aggravated criminal sexual assault, criminal sexual abuse, and obstructing justice. Plaintiff was incarcerated while awaiting trial for 15 months.

On June 9, 2008, the special prosecutor assigned to prosecute Plaintiff dismissed the original charges in return for Plaintiff's guilty plea on two misdemeanor charges of obstruction of justice and official misconduct. The charges were described as "lesser included offenses" of the original charges and arose out of Plaintiff's actions towards Audrey White.

Plaintiff was sentenced to one year of incarceration in the Vermilion County jail and one year of conditional discharge. With credit for time served, he was released on the day of the agreement.

## ANALYSIS

### I. MOTION FOR SUMMARY JUDGMENT

Defendants have moved for summary judgment on the following grounds: (1) Defendant Mills has absolute immunity; (2) Defendant Damilano did not "induce" Mills to prosecute Plaintiff or otherwise do anything to violate Plaintiff's Constitutional rights and thus is entitled to qualified immunity; (3) probable cause existed to support the prosecution of Plaintiff; and (4)

---

Plaintiff was truthful and that the testimony she gave in April 2008 was false. Dow claims she was pressured into the false testimony by Plaintiff and his family.

Defendants Mills and Damilano have qualified immunity. Defendants Gray and Corrie argue that if judgment is granted in favor of Mills and Damilano, it must be granted in their favor as well. They further argue there is no evidence that they participated in a scheme to retaliate against Plaintiff for exercising his First Amendment rights.

**Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56 a district court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002). Speculation, however, is not the source of a reasonable inference. See Burwell, 213 F. Supp. 2d at 929, citing Chmiel v. JC Penney Life Ins. Co., 158 F.3d 966, 968 (7th Cir. 1998).

Therefore, the nonmoving party cannot rest on mere allegations or denials to overcome a motion for summary judgment; "instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004). Specifically, to survive

summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." Kampmier v. Emeritus Corp., 472 F.3d 930, 936 (7th Cir. 2007), citing Celotex Corp., 477 U.S. at 322-23.

### A. Whether Defendant Mills Has Absolute Immunity

Defendants argue that there is no evidence Mills investigated Plaintiff or directed Investigators Kaag and Damilano in their investigation of Plaintiff. Since Mills involvement was only prosecutorial in nature, Defendants believe summary judgment should be granted in Mills' favor on the ground of absolute prosecutorial immunity. Plaintiff responds that Mills is not entitled to prosecutorial immunity because Mills "was involved in the investigation and fabrication of evidence" against Plaintiff.

Plaintiff is alleging government officials took action against him in retaliation for First Amendment speech. "An individual may not be subject to criminal prosecution for exercising his right to free speech." Peals v. Terre Haute Police Department, 535 F.3d 621, 626 (7th Cir. 2008). To establish a prima facie case for a First Amendment retaliation claim, a plaintiff must demonstrate that: (1) the plaintiff engaged in constitutionally protected speech; (2) the plaintiff suffered a deprivation likely to deter the free exercise of plaintiff's First Amendment rights; and (3) the plaintiff's speech was a but-for cause of the defendant's retaliation. Massey v. Johnson, 457 F.3d 711, 716 (7th Cir. 2006) (describing elements of First Amendment retaliation in employment context).

Prosecutors have absolute immunity for their prosecutorial actions. Hartman, 547 U.S. at 261-62; Polzin v. Gage, ___ F.3d ___, 2011 WL 559956, *4 (7th Cir. Feb. 18, 2011). "[P]rosecutors are absolutely immune from liability for damages under 42 U.S.C. § 1983 only

'for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" Houston v. Partee, 978 F.2d 362, 365 (7th Cir. 1992), quoting Burns v. Reed, 500 U.S. 478, 486 (1991), quoting Imbler v. Pachtman, 424 U.S. 409, 430-31 (1976). However, while "[a] prosecutor is shielded by absolute immunity when he acts 'as a an advocate for the State'" he loses that absolute immunity when "his acts are investigative and unrelated to the preparation and initiation of judicial proceedings." Smith v. Power, 346 F.3d 740, 742 (7th Cir. 2003), quoting Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993).

In the instant case, the record shows that Mills never took on an investigative role in the prosecution of Plaintiff. Mills's actions were restricted to processing the information given him by the investigators and then taking the case before the grand jury to request an indictment of Plaintiff based on the evidence provided. The evidence deduced in this case, through affidavits, police reports, and deposition testimony, reveals that the entire investigation of Plaintiff was undertaken by law enforcement- the VCSD and Captain Kaag and Damilano. There is no evidence that Mills had any hand in shaping the investigation or directing or assisting the investigation in any way. In his affidavit, Kaag states that he did not turn over any records or evidence gathered during the investigation to Mills until sometime in February or March 2007, when Kaag and Damilano felt there was enough evidence or initiate a prosecution of Plaintiff.

Plaintiff argues that there is "sufficient evidence from which a jury could conclude that Mills participated in the fabrication of evidence against Lewis." In support of his argument, Plaintiff cites to the U.S. Supreme Court case of Buckley v. Fitzsimmons, where the Supreme Court denied absolute immunity for prosecutors who were accused of fabricating false evidence

and then later took the case before a grand jury and obtained an indictment. The prosecutors attempted to claim absolute immunity because they later obtained an indictment and acted in a prosecutorial role. The Court rejected that argument, stating:

> "That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial. A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial. When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same." Buckley, 509 U.S. 275-76.

Plaintiff's situation, however, is different than that present in Buckley. In Buckley, the prosecutors conducted investigative work themselves to determine whether or not the plaintiff could be arrested. Buckley, 509 U.S. at 275. That is why the Court felt they took on the same function as detectives and were thus entitled to the same immunity as detectives. Buckley, 509 U.S. at 276. Here, the argument advanced by Mills is that he never took on the function of an investigator or detective. Rather, Mills argues that he acted solely as a prosecutor and left the investigative work to the investigators.

According to Kaag, the only contact he had with Mills regarding Plaintiff's case was to advise him in March 2006 that the VCSD was investigating Plaintiff, a reasonable precaution

when investigating a local police officer. Kaag had no further contact with Mills concerning Plaintiff's case until he forwarded his evidence to Mills in February and March 2007 for prosecution. Plaintiff has not identified any evidence in the record that Mills took any part in investigating Plaintiff or even in shaping the investigation from the State's Attorneys office. Plaintiff's claim that Mills told him "wrong answer" when Plaintiff said he had not spoken to the FBI does not show that Mills shed his prosecutorial duties to investigate Plaintiff's case. Plaintiff's claim, supported only by Plaintiff, occurred on March 30, 2007, well after the investigation had concluded and Plaintiff's case was already before the grand jury. Further, Plaintiff's conversation with the FBI did not occur until December 2006, months after the initial spring 2006 complaints had been made against Plaintiff by Danielle Perry. Even taking Mills's supposed statement to Plaintiff into account, there is nothing in it that suggests Mills took on any investigative function, fabricated evidence, or abandoned his prosecutorial role. The record is simply devoid of any evidence that Mills acted in an investigatory fashion and therefore absolute prosecutorial immunity must apply. Judgment is granted in favor of Defendant Mills.

B. Whether Defendant Damilano Has Qualified Immunity

Defendant Damilano argues that he is entitled to qualified immunity because there is no evidence Damilano pressured or coerced witnesses or created any false reports during the investigation so as to induce retaliatory prosecution. Plaintiff claims that Damilano was part of a successful scheme to induce retaliatory prosecution of Plaintiff by fabrication of evidence.

In a situation where a defendant is a non-prosecutor, "an official, like an inspector here, who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to

prosecute." Hartman, 547 U.S. at 262. To succeed on such a claim, a plaintiff must show a causal connection between the official's retaliatory animus and subsequent injury in a retaliation action. Hartman, 547 U.S. at 262. Plaintiff must show that the non-prosecutor "official acted in retaliation, and must also show that he induced the prosecutor to bring charges that would not have been initiated without his urging." Hartman, 547 U.S. at 262. There must be a causal connection between the retaliatory animus of one person and the action of another. Hartman, 547 U.S. at 262; Peals, 535 F.3d at 626. "The plaintiff must also plead and prove, as an element of his case, that there existed no probable cause to support the underlying charge." Peals, 535 F.3d at 626, quoting Hartman, 547 U.S. at 265-66.

Again, Plaintiff's claim against Damilano, like his claim against Mills, must fail for complete lack of evidence. Plaintiff has no evidence of a causal connection between retaliatory animus Damilano may have held against him and Mills's decision to prosecute. Indeed, there is no evidence of retaliatory animus on Damilano's part towards Plaintiff. According to Captain Kaag's affidavit, during the investigation of Plaintiff Damilano acted under the supervision and direction of Kaag at all times. Kaag averred that all of Damilano's investigative efforts were done under his direction and he reviewed all reports in connection with the investigation and that Damilano was never given any direction or supervision by Mills. There is not any clear evidence that Damilano ever even spoke with Mills about Plaintiff's case until he and Kaag turned over their investigative file to Mills in February or March 2007. For all the investigations undertaken by Damilano, there is no evidence that there was any improper motivation to punish Plaintiff for First Amendment speech to the FBI. Rather, the motive appears to be, based on the evidence of record, complaints made by the women about Plaintiff.

Plaintiff's Response contains lurid descriptions of sexual and drug-related escapades involving Mills, Damilano, and the Playpen dancers supplied by Defendant Scott Corrie. Plaintiff's allegations against Damilano appear to come from one source: Jennifer Garrett. The only evidence of Jennifer Garrett's statements concerning Damilano are in a signed declaration made by Plaintiff. They were told out of court to Plaintiff by Garrett and are being offered for the truth of the matter asserted by Plaintiff in his self-serving declaration. As such, Garrett's statements are hearsay and are inadmissible and cannot be used to defeat summary judgment. Gunville v. Walker, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not use inadmissible hearsay to oppose a motion for summary judgment."). Even so, Garrett's claims are not evidence of any animus between Damilano and Plaintiff that would lead Damilano to induce Mills to prosecute Plaintiff for speaking with the FBI.

Even with Amy Dow, who recanted her earlier grand jury testimony and testified that Defendant Corrie promised his dancers monetary compensation for fabricating stories to the police about Plaintiff, there is nothing linking Damilano to Corrie's scheme, which Plaintiff claims as his "most critical piece of evidence" that Defendants worked together to fabricate false accusations against Plaintiff. Rather, the girls were asked to lie to the police about Plaintiff because Corrie did not want Plaintiff in the club because it was hurting the cocaine sales going through the Playpen. There is certainly no evidence that Corrie was acting at the behest of Mills or Damilano. Plaintiff argues that Corrie's presence while Damilano interviewed Dow is proof of their connection, and "if a jury credited this evidence they certainly could conclude there was a concerted effort to fabricate evidence." For a jury to do that, however, they would have to make an enormous logical leap that Corrie's mere presence while Damilano questioned Dow was

evidence of a wider scheme to frame Plaintiff for speaking to the FBI, as opposed to Corrie's stated purpose of keeping Plaintiff out of the Playpen to facilitate his illicit drug trade.

As with Mills, Plaintiff claims that if only the court would draw numerous inferences from tenuous circumstantial evidence, such as the stories of sex and drugs and out of court statements made only in Plaintiff's presence by Defendants Clint Gray and Mills, then a question of material fact would exist for a jury to consider the conspiracy to retaliate against Plaintiff. The problem for Plaintiff is that evidence does not exist, outside of those deep inferences, to create such a question of material fact. There may be plenty of smoke around Mills, such as the FBI investigation and failed prosecution of Plaintiff on the felony counts, but there is no evidentiary fire. Not even an evidentiary matchstick. Plaintiff himself seems to acknowledge this lack of necessary admissible evidence, with his preliminary Response argument that "summary judgment standards have become abusive to plaintiffs in civil rights claims" in the Seventh Circuit and various arguments and contentions about what inferences *could* be made based on pieces of evidence. As it stands, the record contains no admissible evidence of retaliatory animus on the part of Damilano or of Damilano's influencing Mills's decision to charge Plaintiff. See Peals, 535 F.3d at 627. Therefore, Damilano is entitled to qualified immunity and judgment must be granted in his favor.

C. The Claims Against Defendants Corrie and Gray

With judgment granted in favor of government officials Mills and Damilano, the only remaining § 1983 claims are against non-government Defendants Corrie and Gray. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a

person acting under the color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

First, as it pertains to Defendant Gray, there is no evidence that Gray conspired with Mills and Damilano to have Plaintiff prosecuted. All Plaintiff has is his supposed conversation with Gray, where Gray warned him he was messing with dangerous people and Gray could no longer "protect him." This conversation, however, in no way implicates Gray in a scheme with Mills and Damilano to have Plaintiff arrested and prosecuted for sexual assault. For many of the same reasons given in the court's discussion of Damilano's immunity, judgment is granted in favor of Defendant Gray.

This leaves Scott Corrie as the only remaining defendant. Arguably, of all the defendants, the evidence that something improper occurred as to Plaintiff's prosecution is strongest against Corrie, based on Amy Dow's April 2008 trial testimony. However, the court has already determined that both Mills and Damilano are immune due to there being no evidence whatsoever that they conspired to fabricate evidence against and prosecute Plaintiff because of his contact with the FBI.

"To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individuals were willful participants in joint activity with the State or its agents." Reynolds v. Jamison, 488 F.3d 756, 764 (7th Cir. 2007) (internal citations omitted); see also Stagman v. Ryan, 176 F.3d 986, 1003 (7th Cir. 1999) ("We have held that to establish joint action, a plaintiff must demonstrate that the public and private actors shared a common, unconstitutional goal."). "Vague and conclusory allegations of the existence of a conspiracy are not enough to sustain a plaintiff's burden; a complaint must contain factual

allegations suggesting that defendants reached a meeting of the minds" with respect to violating Plaintiff's constitutional rights. Evers v. Reak, 21 Fed.Appx. 447, 450 (7th Cir. 2001). "Moreover, private actors do not act under the color of state law merely [by] calling on the law for assistance, even though they may not have grounds to do so; rather, 'there must be a conspiracy, an agreement on a joint course of action in which the private party and the state have a common goal.'" Mirbeau of Geneva Lake, LLC v. City of Lake Geneva, ___ F. Supp. 2d. ___, 2010 WL 4260085, *4 (W.D. Wisc. Oct. 27, 2010), quoting Hughes v. Meyer, 880 F.2d 967, 972 (7th Cir. 1989).

Here, taking Dow's April 2008 statements at face value and in the light most favorable to Plaintiff, Corrie had dancers at Playpen fabricate evidence against Plaintiff because Corrie did not like Plaintiff coming around the club and disrupting his drug business. There is still no evidence that Corrie acted in concert with either Mills or Damilano to frame Plaintiff because Plaintiff spoke with the FBI. The court has already found that Mills did not initiate, direct, or assist in the investigation of Plaintiff. The court has already found that Damilano did not investigate Plaintiff and induce Mills to indict Plaintiff out of any retaliatory animus due to Plaintiff's meeting with the FBI. While Corrie may have encouraged the girls to file false police reports about Plaintiff due to Plaintiff's presence at the Playpen making it difficult to conduct drug sales, there is simply no evidence of any meeting of the minds or agreement on a joint course of action with a common goal between Corrie, Mills, and Damilano concerning Plaintiff so as for Corrie to be acting under color of state law in a § 1983 retaliatory prosecution conspiracy action. Stagman, 176 F.3d at 1003; Hughes, 880 F.2d at 972; and Evers, 21 Fed.Appx. at 450. Therefore, judgment must be granted in favor of Defendant Corrie.

## II. MOTION FOR SANCTIONS

Defendant Clint Gray filed a Motion for Rule 11 Sanctions (#64) on January 5, 2011. In the motion, Gray notes that by the time discovery in this case expired in November 2010, Plaintiff had not sent him any discovery requests and did not depose him at any time during the discovery period. On November 30, 2010, Gray directed his attorney to request a dismissal of the case against him based on a lack of evidence supporting Plaintiff's allegations against him. Gray's counsel sent an e-mail to that effect. On December 13, 2010, Gray sent a draft of this proposed Motion for Sanctions via e-mail and U.S. mail to counsel for Plaintiff. Gray waited 21 days for the complaint against him to be dismissed with prejudice. Gray argues that (1) none of the witnesses support Plaintiff's claim that Gray was a part of any conspiracy; (2) no testimony or evidence in this case has implicated Gray in any fashion; (3) sanctions are appropriate because Plaintiff should have known Gray had no relationship with Mills and Gray did not take any action in regard to "fabricating evidence" against Plaintiff. Gray believes Plaintiff filed and continued this lawsuit without an evidentiary basis because he does not like Gray and wants to harass him. Gray requests attorneys fees and costs from Plaintiff.

Plaintiff argues that, based on the conversation Plaintiff had with Gray where Gray warned Plaintiff about speaking with the FBI and said he could double his pay if he went along, "there is evidence to suggest Gray was involved in the underlying events Lewis complains of."

Rule 11(b) of the Federal Rules of Civil Procedure states:

> "**Representations to the Court.** By presenting to the court a pleading, written motion, or other paper - whether by signing, filing, submitting, or later advocating it- an attorney or unrepresented party certifies that to the best of the

person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

    (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

    (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

    (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

    (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information." Fed. R. Civ. P. 11(b).

The central purpose of Rule 11 is to deter baseless filings in district court. Johnson v. A.W. Chesterton Corp., 18 F.3d 1362, 1365 (7th Cir. 1994), citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990). However, "while the purpose of the rule is to lessen frivolous claims and defenses, it is 'not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories.'" Johnson, 18 F.3d at 1365, citing Advisory Committee Note, 97 F.R.D. 165, 199 (1983).

While the court has found Plaintiff's claims against Gray deficient as a matter of law, that does not mean they are sanctionable under Rule 11. The court ultimately determined that there was no competent evidence in the record so as to create a genuine issue of material fact as to

Gray's participation in a conspiracy to fabricate evidence against Plaintiff for exercising his First Amendment rights. However, as noted above, there was plenty of smoke in this case involving FBI investigations and lurid allegations and the court does not find Plaintiff's claim to be completely frivolous. The court will not punish with sanctions the attempt of Plaintiff and his attorney to pursue factual and legal theories in support of those allegations. See Johnson, 18 F.3d at 1365. Defendant Gray's Motion for Rule 11 Sanctions (#64) is DENIED.

IT IS THEREFORE ORDERED:

(1) Defendants' Motions for Summary Judgment (#58), (#60), (#61) are GRANTED in their entirety. Judgment is granted in favor of all Defendants. Judgment is granted against Plaintiff.

(2) Defendant Gray's Motion for Rule 11 Sanctions (#64) is DENIED.

(3) This case is terminated.

ENTERED this 31st day of March, 2011

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE